**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| HOUSTON FEDERATION OF TEACHERS, TEXAS AMERICAN FEDERATION OF TEACHERS, JACKIE ANDERSON, MAXIE HOLLINGSWORTH, AND DANIEL SANTOS, | § § § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO. _____ 5:20-cv-222 Complaint for Declaratory Judgment and Injunctive Relief |
| v. | § § | |
| THE TEXAS EDUCATION AGENCY; MIKE MORATH, COMMISSIONER OF EDUCATION, in his official capacity, | § § § § | |
| *Defendants*. | § § | |

---

**PLAINTIFFS' ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

### I.    Introduction

1.    This is a claim based on the Voting Rights Act, 52 U.S.C. Section 10301 *et seq*. (Section 2 of the Voting Rights Act of 1965, as amended), as well as related provisions of the United States Constitution and Texas Constitution. The plaintiffs are individual teachers and voters and their labor union, the Houston Federation of Teachers and Texas American Federation of Teachers. The claims arose following the decision in late 2019 by the Texas Education Agency (TEA) to remove the elected board of trustees of Houston Independent School District (HISD) and replace them with an unelected board of managers appointed by TEA.  The investigation and asserted premises for such a drastic intervention are significantly flawed. Further, similar interventions in other Texas school districts have actually led to worse educational outcomes for students. In January 2020, a state district judge in Travis County issued a temporary injunction to prevent TEA's take-over upon finding that it is likely that it will be shown at trial that TEA acted contrary to the governing law in imposing this sanction on HISD. While the issue of

1

TEA's violation of state law is being fought in state court, plaintiffs bring this action to raise the additional claim that TEA's planned removal of the elected board members is fueled by racial animus, constitutes the illegal deprivation of the voting rights of tens of thousands of minority voters in HISD, and violates the Voting Rights Act.

## II. Parties

2.      Plaintiff Houston Federation of Teachers (HFT) is a labor union that represents over 6,100 employees employed by HISD.  It represents teachers, librarians, counselors, nurses, teaching assistants, and other employees of HISD. It is by far the largest employee organization in HISD. It advocates for the employment rights of its members and champions high quality public education, fairness, democracy, and economic opportunity for students, families, and communities. Part of its mission is to educate its members on voting and to help its membership select leaders who embrace and uphold the interests of its members and the values of the union. In addition, the union expends resources from appropriate and legal sources associated with increasing voter turnout and fostering democratic values. Those expenditures and efforts are wasted when the elected leadership of the HISD board of trustees will be replaced with an unelected board of managers. Most of the members of HFT are residents, voters, and taxpayers of HISD. Finally, every member of HFT is an educator or education support employee whose professional lives are threatened by the policies and choices of the board of managers. HFT's offices are at 2704 Sutherland St, Houston, Texas 77023 and it may be served through its counsel of record in this cause of action.

3.      Plaintiff Texas AFT is a statewide labor organization that represents employees of public school districts across Texas in matters related to their wages, hours, and terms and conditions of employment. Texas AFT has over 65,000 members in Texas and is affiliated with

the American Federation of Teachers at the national level, as well as the AFL-CIO. Texas AFT and its national affiliate, AFT, have more than 6,100 members in HISD and more than 4,600 in the San Antonio area, including in San Antonio ISD, South San Antonio ISD, North East ISD, Harlandale ISD, and Northside ISD. Texas AFT has its principal place of business at 3000 S. IH-35, Suite 175, Austin, Texas, 78704-6536, in Travis County, Texas.

4. Plaintiff Jackie Anderson is a resident of Harris County, Texas and resides within the boundaries of HISD. She resides in one of HISD's majority-minority single member districts. She is a frequent voter and participant in HISD elections and, also, an HISD educator. She is African-American. Ms. Anderson will lose her federally-protected right to vote for a candidate of her preference should TEA be allowed to replace the elected board of HISD with a board of managers. In addition, Ms. Anderson will be injured by the policy choices made by the board of managers in relation to her existing teacher contract. She may be served through her counsel of record in this cause of action.

5. Plaintiff Maxie Hollingsworth is a resident of Harris County, Texas and resides within the boundaries of HISD. She resides in one of HISD's majority-minority single member districts. She is a frequent voter and participant in HISD elections and she is also an HISD educator. She is African-American. Ms. Hollingsworth will lose her federally-protected right to vote for a candidate of her preference should TEA be allowed to replace the elected board of HISD with a board of managers. In addition, Ms. Hollingsworth will be injured by the policy choices made by the board of managers in relation to her existing teacher contract. She may be served through its counsel of record in this cause of action.

6. Plaintiff Daniel Santos is a resident of Harris County, Texas and resides within the boundaries of HISD.  He resides in one of HISD's majority-minority single member districts. He

is a frequent voter and participant in HISD elections and he is also an HISD educator. Mr. Santos is Latino, and a naturalized citizen. Mr. Santos will lose his federally-protected right to vote for a candidate of his preference should TEA be allowed to replace the elected board of HISD with a board of managers. In addition, Mr. Santos will be injured by the policy choices made by the board of managers in relation to his existing teacher contract. He may be served through its counsel of record in this cause of action.

7.   Defendant Texas Education Association ("TEA") is a state agency of the State of Texas that monitors school Texas' public school districts for compliance with federal and state guidelines. It may be served at 1701 N. Congress Ave., Austin, Texas 78701. Its headquarters is in the Western District of Texas

8.   Defendant Mike Morath is the Texas Commissioner of Education who directs the TEA. He may be served at 1701 N. Congress Ave., Austin, Texas 78701 in the Western District of Texas.

### III.   Jurisdiction and Venue

9.   Plaintiffs' complaint arises under the United States Constitution and federal statutes. This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) & (4), 1367(a) and 42 U.S.C. §§ 1983, 1988.

10. Venue is proper in the Western District of Texas. 28 U.S.C. § 1391(b)(1) as defendant TEA resides in this district.

11.  Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

### IV.   Facts

12.   Houston ISD is one of the most diverse districts in the state of Texas. As the largest school district in the state, HISD works to provide a successful and stable learning environment to approximately 210,000 students at 280 campuses.

13. Houston ISD's student population is 61.84% Hispanic, 24.02% African American, 8.7% White, and 4.05% Asian. The demographics of Houston ISD's voting population is substantially similar to the demographics of its student population.

14. To date, nearly every school district in which TEA has attempted to replace an elected board of trustees with an unelected board of managers has been a school district in which a majority of the students were people of color. This has resulted in a disparate impact on people of color in the state of Texas.

**A.  The TEA Investigation**

15. On December 13, 2018, the HISD board of trustees held a meeting to consider turning over some failing schools to a charter school operator. Community members protested such action because they wanted HISD to keep control of its schools. The proposal failed in a 5-4 vote.

16.  On January 3, 2019, Governor Abbott published the following statement on Twitter regarding Houston ISD in response to the District's rejection of partnering with a charter school operator: "What a joke. HISD leadership is a disaster. Their self-centered ineptitude has failed the children they are supposed to educate. If there was a school board that needs to be taken over and reformed it's HISD. Their students & parents deserve change."

17. On January 22, 2019, three weeks after the Governor's public statement, TEA launched a Special Accreditation Investigation.

18.  The ensuing investigation lasted several months. The investigation was amended twice in an attempt to find any violation that might give justification for the extraordinary action of removing the board of trustees.

19. On August 5, 2019, TEA issued a preliminary report regarding the Special Accreditation Investigation threatening to lower Houston ISD's accreditation status, appoint a conservator, and install a board of managers "in accordance with Tex. Educ. Code §39.057(d) to replace the existing Board of Trustees."

20. On November 6, 2019, TEA sent a letter to HISD Superintendent Lathan stating that the District's Accreditation Status will be lowered to "Accredited-Warned". According to the Commissioner, "[t]his letter provides the district notice of my appointment of a board of managers to Houston ISD." The board of managers will be appointed for an indefinite term, which may subsume several election cycles.

21. The investigation and its outcome are fueled by a racially impermissible purpose, retaliation against people of color and their leaders for disagreeing with the TEA and Governor Abbott on education policy.

22. In response to the investigation, HISD sued the TEA and Commissioner Morath in a Travis County district court seeking relief for violations of state and federal law. HISD sought an injunction preventing the TEA from taking any action against the district or its board of trustees. The case was removed to a federal district court. Judge Lee Yeakel dismissed HISD's federal claims for lack of standing and remanded its state-law claims.

23. Upon remand, on January 8, 2020, the state district court issued a temporary injunction prohibiting the TEA and Commissioner Morath from appointing a board of managers to oversee

HISD's operations and from imposing any sanctions or interventions on the district. The Court found that the TEA and Commissioner Morath was not authorized by Texas law to remove the elected Board of Trustees of HISD nor sanction HISD based on the Special Accreditation Investigation. The Court found that HISD "had shown a probable right of recovery" for their allegations that TEA and Commissioner Morath were acting *ultra vires*, or beyond their authority. TEA's appeal of that decision is currently pending.

### B. Single-Member Districts and their Trustees

24.  The Board of Trustees for HISD is made up of nine members elected from single-member districts enumerated by Roman numerals. These elections are non-partisan.

25. On June 23, 2011, the Board adopted a resolution concerning the redrawing of district lines. On July 1, 2013, the Texas Commissioner of Education ordered that the former North Forest Independent School District be annexed to HISD.  Accordingly, HISD trustee districts had to be realigned in order to incorporate the newly annexed area

26. On November 5, 2019, HISD voters held an election for Districts II, III, IV, and VIII. On December 14, 2019, the runoff elections were completed in District II and IV.

27. District I is located in the Upper Central part of HISD and is a majority Latino district. It has historically elected the Latino-preferred candidate. It is currently represented by Trustee Elizabeth Santos. Trustee Santos was elected in 2017 and is Mexican American.

28. District II is also located in Upper Central part of HISD. It is a majority-minority district with Anglos making up less than 12 % of the population. It has historically elected the minority-preferred candidate. It was represented by Trustee Rhonda Skillern-Jones, an African American elected official. On November 5, 2019, HISD held an election for HISD Trustee, District II. The

race was set for run-off with the two top vote-getters, Kathy Blueford-Daniels and John Curtis Gibbs. Both run-off candidates are African American. On December 14, 2019, Kathy Blueford-Daniels won the runoff election. She was sworn-in as the Trustee for District II on January 16, 2020.

29. District III is located in the South Eastern portion of HISD. It was represented by Sergio Lira. District III is heavily Hispanic and a Latino-majority single member district. It has historically elected the Latino-preferred candidate. On November 5, 2019, HISD held an election for HISD Trustee, District III. In this election, Dani Hernandez defeated Sergio Lira. Ms. Hernandez is the child of immigrants and is a Latina.

30. District IV is located partly in the Third Ward in Houston. It is a majority African American district formerly represented by Trustee Jolanda Jones, an African American elected official. District IV has historically elected the African American-preferred candidate. On November 5, 2019, HISD held an election for HISD Trustee, District IV. The race went to a run-off election. The top vote getters were Candidates Patricia K. Allen and Matt Barnes. Both of these candidates are African American. On December 14, 2019, Patricia Allen defeated Mr. Barnes. She was sworn-in as the Trustee for District IV on January 16, 2020.

31. District V is located in the South Western portion of HISD. It is on the cusp of being a minority-majority district. It is currently represented by Trustee Sue Dimenn Deigaard.

32. District VI is located on the Western edge of HISD. It is a majority-minority district whose population is roughly 35% Anglo, 20% African American, 30% Latino, and 10% Asian American. This incredibly diverse district is emblematic of HISD's economic and demographic diversity. District VI elects the candidate of choice of the minority community. It is currently

represented by Trustee Holly Maria Flynn Vilaseca.  She is the daughter of a Colombian immigrant, and is the first in her family to go to college.

33. District VII is located in the Western portion of HISD. It is a plurality Anglo district with 48% of its total population and 52% of its voting age population being Anglo. It is currently represented by Trustee Anne Sung. Sung is a product of HISD, having attended Askew Elementary School, T.H. Rogers Middle School, and Bellaire High School. She graduated magna cum laude from Harvard University with a bachelor's degree in physics and mathematics. She also earned master's degrees in physics and public policy, also from Harvard. Trustee Sung is an Asian American.

34. District VIII is located in the North Western portion of HISD. It is a majority Latino district, which has historically elected the candidate of choice of the Latino community. Currently, Board President Diana Davila represents District VIII. On November 5, 2019, HISD held an election for HISD Trustee, District VIII. In this election, Trustee Davila lost to Candidate Judith Cruz. Both candidates are Latinas.

35. District IX is located on the Southern edge of HISD and is currently represented by Trustee Wanda Adams. District IX is majority African American and has historically elected the candidate of African American choice. Trustee Wanda Adams was first elected to the HISD Board of Education in 2013 after serving the limit of three two-year terms as Houston City Councilmember for District D. Ms. Adams is a native Houstonian and product of HISD, graduating as a basketball standout from Kashmere High School. She received an athletic scholarship to Texas Southern University, where she earned her Bachelor of Science degree in public affairs and a master's degree in public administration. Trustee Adams is African American.

36. Out of nine districts, six are heavily majority-minority, each electing the preferred choice of the minority voters in those districts. Out of the remaining three districts, only one is an Anglo majority district. Latinos are sufficiently numerous and compact so as to form a majority in three of the 9 HISD Trustee Districts. African Americans are sufficiently numerous and compact so as to form a majority in two of the 9 districts. In addition, minorities, in coalition, are sufficiently numerous and compact as to form a majority in, at least, 1 of the 9 districts.

37. Currently, HISD is represented by 9 trustees, 8 of whom are people of color. All are women.

**C.  Racially-Polarized Elections**

38. Elections are racially-polarized in HISD elections.

39. Latinos are politically cohesive in HISD elections and vote as a bloc for Latino-preferred candidates.

40. African Americans are politically cohesive in HISD elections and vote as a bloc for African American preferred candidates.

41. Minorities like Latinos, African Americans, and Asian Americans are politically cohesive together in HISD elections and vote as bloc to elect minority-preferred candidates.

42. In Texas and in HISD, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In each of HISD's Trustee districts and throughout HISD as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.

43. In HISD, minority voting power is protected through the creation of minority- majority Trustee districts.

### D. Totality of Circumstances

### i. History of Discrimination

44.  Texas has a despicable and regrettable history of racism. HISD, itself, has also had a troubling history of segregation and racial conflict.

45. In 1956, two years after the Supreme Court decided *Brown v. Topeka Board of Education,* a group of parents of black children enrolled in the Houston Independent School District (HISD) filed suit to desegregate its schools. After twenty-five years of court proceedings and twelve years of operation under a court-ordered desegregation plan, the district court has now decided that the school district has eliminated all vestiges of de jure segregation and has become unitary." *See Ross v Houston ISD*, 699 F.2d 218 (5th Cir. 1983). The desegregation process in HISD was complicated and did not fully end until the 1980s.

46. Throughout the 1970s, Harris County, generally, and HISD, specifically, were racially segregated. "Segregation was so entrenched in the tradition of HISD that the school district attempted to circumvent the spirit of *Brown 's* instruction to desegregate by reclassifying Latinos as Anglos such that schools were "desegregated" by integrating Blacks with Latinos…During this period, there was significant disparity between the educational experiences of Anglo students and Latino students; Latinos were receiving a decidedly inferior educational experience characterized by inadequate facilities, outdated curricula, and limited educational enrichment opportunities." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 779 (S.D. Tex. 2013).

### ii. Racial Polarization

47. In Harris County and HISD, Anglos support different candidates than either Latinos or African Americans.

48. Elections in HISD are deeply racially polarized.

49. Throughout Texas, federal courts have found that the elections in Texas bear the taint of racial polarization. "Regardless of methodology, … experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan  C185).

50. "Hispanic voters are politically cohesive in general and primary elections. African-American voters are politically cohesive in general and primary elections. With the exception of Travis County, Anglo voters are politically cohesive in general elections in support of the Republican candidate, regardless of the candidate's race." *Id.* at ¶¶ 703, 704, and 707. Federal courts have recently found that elections in Harris County also shows strong signs of racial polarization.  "[T]he Latino community does not merely vote straight party ticket, instead they are bloc voting Latino surnamed candidates…..Moreover, when Anglos have the opportunity to choose between a Latino Republican candidate or an Anglo Republican candidate, they tend to choose the Anglo Republican candidate. Thus, the evidence shows that race is playing a factor in the decisions of both Anglos and Latinos in their selection of candidates." *Rodriguez v. Harris Cnty., 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013).*

### iii. Existence of Any Electoral Mechanisms that Enhance the Opportunity for Minority Vote Dilution

51. In the past decade, the State of Texas has instituted several barriers to minority participation that enhance minority vote dilution.

52. In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas was found to have intentionally racially discriminated against minority voters by enacting and in the enforcement of its Voter ID law.

53. Also in 2011, Texas enacted several redistricting plans many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. In addition, in the adoption of those plans, a three-judge panel found that Texas had intentionally discriminated against minority voters.

54. Recently, Texas instituted a voter purge of its voting rolls supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens. Texas settled these claims before a court could make a determination of Texas' intent in these matters.

55. Harris County, itself, has had a troubling history of voter disfranchisement. "In 2008, a number of Latino residents reported that the Harris County Tax Assessor's Office, which is responsible for voter registration, was not timely processing the voter registration applications of Latino citizens….The Harris County Tax Assessor–Collector and Registrar of Voters, Paul Bettencourt, used his position in 2008 to slow the dramatic rise in voter registrations that year among younger, mostly minority, applicants." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 781 (S.D. Tex. 2013).

56. In addition, in the recent past, the County has failed to provide bi-lingual voting materials that would assist non-English-speaking voters.

**iv. Socio-Economic Disparity**

57. In Harris County, there is a strong and consistent correlation between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

58. Anglos have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos. African Americans in Harris County have an unemployment rate of 10.9%, which is more than twice the unemployment rate of Anglos. In Harris County, the per capita income for African Americans is $22,511, which is less than half the Anglo median income.

59. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level. The African American poverty rate in Harris County is 15.9%.

60. Latinos in Harris County are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

61. Under the segregated system of HISD, there were thousands of children who have not been given the appropriate resources needed to learn English. Today, those same children are adults with limited English proficiency. These limited English proficient adults do not possess the language skills that would facilitate participation in the democratic process. A person's

educational attainment affects their involvement in campaigns and may affect their ability to cast an effective vote.

62. Economically disadvantaged people tend to become disaffected, believing that government does not and will not respond to their needs. This also lowers their participation in elections. For example, Latinos in HISD have some of the lowest turnout rates throughout Harris County.

63. The socioeconomic disparities that exist in Harris County impact the ability of the minority community to influence state officials, state elections, and state educational policy, as whole.

**v.  Racial Appeals in Political Campaigns**

64. Political campaigns in HISD and Harris County have been characterized by overt and subtle racial appeals.

**vi.  Success of Minority Candidates in HISD**

65. Before the creation of single-member districts in HISD in 1975, Latino-preferred candidates were rarely successful in trustee elections. The Board was expanded in 1981 to include two more single member districts.

66. Before the creation of single-member districts in HISD, African American-preferred candidates were rarely successful in trustee elections.

67. Before the creation of single-member districts in HISD, minority-preferred candidates were rarely successful in trustee elections.

68. In Texas, minority-preferred candidates for state office are rarely, if ever, successful.

69. In Texas, African American preferred candidates for state office are rarely, if ever, successful.

70. In Texas, Latino-preferred candidates for state office are rarely, if ever, successful.

**vii. Responsiveness of Elected Officials**

71. The Trustees of HISD are more responsive to the needs of taxpayers, voters, students, and HISD employees than an unelected board of managers.

**viii. Tenuousness of Replacing HISD Trustees with Unelected Board of Managers**

72. The removal of HISD elected representatives has occurred because of a groundless investigation that has the agenda to remove from power elected officials elected by people of color who disagree with the preferred educational policy of the Governor and Commissioner of Education.

73. TEA asserts that Houston ISD board members have overstepped their authority by acting "individually on behalf of the Board" and that Houston ISD board members have violated contract procurement rules. In addition to these allegations, TEA alleges that the HISD Board has violated the Texas Open Meeting Act (TOMA). Finally, the TEA listed the poor performance of one high school in the entirety of HISD as a reason for the takeover. These allegations are unfounded. They are a fig leaf to obscure the real intentions of TEA and the Governor and the State of Texas. In addition, other ISDs that are elected by Anglo voting majorities have boards that are alleged to have violated procurement rules, TOMA, or have campuses that rate poorly but which have not been subjected to a state takeover. For example, Richardson ISD, whose board members are all Anglo, has been credibly accused by a former board member of engaging in "walking quorums", which is the same activity alleged by TEA against HISD. The TEA has

not initiated an action to take over the board of Richardson ISD, since the allegations of violating the TOMA have been made.

74. HISD's democratically elected majority-minority school board had many of the same challenges other urban districts faced throughout the state. However, it faced unusual scrutiny from the constantly meddling TEA because it refused to privatize. After a scathing report which was riddled with arbitrary outcome-driven reasoning, the Commissioner alleges the takeover is mandated by a law that requires the TEA to take over an entire school district or shut down a low-performing campus if one school chronically underperforms. HISD as a whole scored a well-above-average 88 academic accountability rating, with just one school out of nearly 300 campuses, Wheatley High School, scoring a 59. But that's not the whole story.

75. Several Houston charter schools scored lower, but are allowed to continue operating and are not being singled out in the takeover. Wheatley -- a school comprised of black and Latino students – was able to overcome an accountability system based primarily on standardized tests and pass with a 63. Wheatley would not have been taken over, were it not for a rule that TEA Commissioner Morath enacted in 2018 that allowed TEA to downgrade the rating of a school that did not pass three of four measures, even if the school would have passed otherwise. For Wheatley High School, a passing grade of D was curved down to an F, putting it past the five-year limit set in 2015 and setting up a false choice.

76. In addition, in 2018-2019 and 2017-18, there are other Texas school districts with the same or worse accreditation status, but whose school boards are not governed by majority minority boards of trustees, and in which the Commissioner did not take action to replace the elected trustees with a board of managers, including Natalia ISD, Buckholts ISD, Dell City ISD, and Dimebox ISD.

77. There has been no violation of the Texas Open Meeting Act (TOMA). Not only is any violation of TOMA possibly criminal; but also, may be enforced by civil suit. No party from the State or the public has sought these remedies. Whatever injuries that could have occurred from these supposed violations may be remedied without eliminating the constitutionally protected right to vote.

78. There has been no violation of procurement policies by Trustees of the HISD that would be remedied by the removal of these trustees. Districts throughout Texas have periodic issues regarding contracting and procurement. Violating the rules and law associated with procurement also may be remedied by criminal or civil enforcement action without causing injury to the voting rights of thousands of voters.

79. There has been no over-stepping by members of the Board of Trustees.

80. The stated rationales for the removal of these elected officials are unfounded.

81. The election change sought by the TEA and the State of Texas is tenuous and not grounded in fact or reason.

**E. History of the TEA's use of Board of Managers to suppress minority voters**

82. Since 2008, TEA has appointed or proposed appointment of a board of managers in 14 public school districts, including Houston ISD. Of those 14 districts, only Shepherd ISD has a student body that is majority white. The other districts have student bodies that are majority minority (majority non-white).

83. Except for Shepherd ISD, each of these school districts have school boards that were elected by majority minority voter populations.

**F.  HISD is both Academically and Financially Fit**

84.   HISD is currently an academically and financially healthy school district that has seen excellent improvement in campus performance and student outcomes. In 2018, 92% of HISD's campuses (252 out of 275) were rated "Met Standard." In 2018, although the District did not officially receive an accountability rating as result of Hurricane Harvey, if it had received an accountability rating, the District would have received a "B" rating with 84 out of 100 possible points.

85. HISD is financially stable and rates highly in financial integrity unlike previously board of manager school districts. In 2018, the District received a Superior Rating (i.e., an "A") in the Financial Integrity Rating System of Texas. Houston ISD received a rating of 90 out 100. The School Financial Integrity Rating System of Texas ("FIRST"), ensures that Texas public schools are held accountable for the quality of their financial management practices and that they improve those practices. The system is designed to encourage Texas public schools to better manage their financial resources to provide the maximum allocation possible for direct instructional purposes. According to FIRST, Houston ISD's financial integrity is superior.

86. HISD is not unlike many Anglo school districts in achievement and governance. More importantly, HISD' student population exceeds the student population of all the previous over-taken districts combined.

87. The real reason that TEA has aggressively intervened into the governance of HISD is twofold. First, the HISD trustees did not rubberstamp TEA's preferred education policy, the use of in-district charter schools with a mixed track record of student achievement. Second, the decision to reject this privatization initiative was made by people of color and their elected leaders.

**G. TEA's choice to disfranchise HISD voters is Intentionally Discriminatory**

**i. Disparate Impact**

89**.** TEA has focused its aggressive takeover of school boards almost exclusively on ISDs with a majority of minority students and with a majority of minority voters.

90. TEA's interventions have rarely led to academic improvement in the school districts in which Boards of Managers have been appointed. After the takeover of the El Paso ISD Board of Trustees, student performance declined precipitously in all areas of academic measurement, including student achievement, student progress, closing performance gaps, and postsecondary readiness.

91. TEA has often mismanaged these boards, as well. In 2019, Commissioner Morath appointed a convicted felon to the Marlin ISD Board of Managers. Applicants for the board of managers are not asked about criminal convictions and the TEA's background check did not reveal the conviction until after the appointment.

92. TEA appoints members of the boards of managers that have had limited experience in education.  The vast majority of new applicants for a Houston board of managers also lack educational experience. TEA also has the authority to appoint non-certified superintendents.

93. TEA seeks managers who do not question its authority and rubber-stamp its pro-charter school agenda. TEA Commissioner of Education Mike Morath ousted one of his appointed board members to Edgewood ISD, Amanda Gonzalez, in September 2017 via email without any prior conversations or any reasons for the decision. Gonzalez concluded she was removed for asking challenging questions. She said "I believe that student outcomes are not the focus for the district,

nor has it been the focus for TEA, and I feel when I've raised those types of concerns to TEA, I was reprimanded."

94. Since 2008, 13 of the 14 school districts targeted by TEA for takeover were minority school districts.[1] These investigations and interventions have been focused largely on urban school districts, especially in San Antonio. Southside ISD and Edgewood ISD have already had their elected leadership replaced by TEA. Harlandale ISD has been investigated and threatened with board removal. And, South San Antonio ISD is currently under TEA investigation.

95. This aggressive policy toward minority majority school districts creates two kinds of disparate outcomes. First, with rare exception, only schools with minority majority student populations and voting populations are targeted for takeover. Second, boards of managers acting at the direction of the TEA worsen educational outcomes for the students in these ISDs. So, not only are minority school districts targeted more for takeover; they are also made worse because of the takeover.

**ii**. **Legal & Historical Background of Boards of Managers**

96. By statute, TEA has the ability to take over a school district or charter school due to problems with finances, governance, academics, or health and security. In recent years, TEA has used its rulemaking process to implement far-reaching authority for the commissioner to penalize public school districts while providing every advantage to unelected charter schools. This kind of authority to circumvent voters and encourage privatization through charter growth was never envisioned by the state legislature.

---

[1] The lone exception to TEA's interventions against minority-majority school districts is Shepherd ISD. In 2010, Shepherd ISD had a voting age population of 2,603 total people. In 2010, this population contained 1,718 Anglos, 272 African Americans, and 646 Latinos.  Thus, in 2010, 66% of the voting age population in Shepherd ISD was Anglo. *See* Texas Legislative Counsel RED-635, p. 23. Today, those numbers are vastly different.

97. TEA rules allow the commissioner to remove an entire elected public school board and to single-handedly appoint a board of managers for the district when TEA deems a single campus to be consistently low-performing. Initially, TEA could only take over a school district for two years. But in 2015, the law was changed to extend the authority of the state board of managers for another 2 years.

98. TEA treats traditional public schools differently than charter schools. TEA rules have been constructed to put significant pressure on public schools deemed low performing to either "partner" with a charter operator or face board of management takeover by the state. TEA has implemented rules requiring total abandonment of the elected school board functions among these so-called "partnerships" and is now proposing new rules that place significant new barriers and costs for non-profit entities while enabling an expedited process for charter schools to take over all elected school board duties.

99. TEA targets school districts for takeover that refuse to partake in partnerships with charter schools and that are minority majority in population.

**iii. Sequence of Events leading up to the proposed takeover of HISD**

100**.** Houston ISD has been assigned accreditation ratings of "Accredited" acceptable district-level academic ratings under Tex. Educ. Code §§ 39.053 and 39.054; and acceptable financial accountability ratings. In 2019, TEA assigned Houston ISD an overall academic accountability rating of B, with a scaled score of 88.

101. On December 13, 2018, HISD rejected a "partnership" with a charter school. This was a close decision with a narrow 5-4 vote.

102. Then, the Governor of Texas called this decision "a joke". In fact, he made it clear that he believed that HISD need to be "taken over" and "reformed".

103. On January 22, 2019, TEA launched Special Accreditation Investigation (SAI # INV2019-10-034) "in response to multiple complaints received by the TEA's Special Investigations Unit" about alleged violations of the following Texas laws: "1) Tex. Educ. Code § 11.051. Governance of Independent School District, 2) Tex. Educ. Code § 11.1511 Specific Powers and Duties of the Board, 3) Tex. Gov't Code Chapter 551 Open Meetings".

104. On March 24, 2019, TEA prepared a second amended Notice of Special Accreditation Investigation notifying Houston ISD that the SAI was investigating the additional allegation that "Houston ISD Board of Trustees may have violated the contract procurement process, competitive bidding, awarding, and management of contracts" in violation of Tex. Educ. Code § 44.031.

105. In the course of its actions against HISD, TEA has committed multiple *ultra vires* acts, which were unauthorized by Texas law. These unlawful and unauthorized *ultra vires* acts include the following: 1) converting a campus-level conservator into a district-level conservator; 2) seeking a district-level conservator for the entirety of HISD; and, 3) seeking the replacement of HISD's Board of Trustees. Each of these actions is a deviation from normal procedure.

106. On November 6, 2019, the Commissioner notified Houston ISD that he intended to appoint a board of managers to Houston ISD to exercise the powers and duties of the district's board of trustees, in accordance with Tex. Educ. Code §39A.201.

107. The Commissioner intended to appoint a board of managers on the basis of the academic accountability ratings of Wheatley High School, the appointment of a conservator

during four consecutive school years, and a lowered accreditation status. Each of these rationales is a fig leaf for TEA's true intention.

108. Wheatley High school would have received a passing grade in the most recent school year except that the TEA changed the rules. The TEA implemented what is known as a "forced failure" rule that states no matter how well a school performs, if it receives an "F" rating in three of the four domain areas, then the highest scaled score a district or campus can receive for the overall rating is a 59. This rule, and this rule alone, was the cause of Wheatley High School to be deemed a failure. This rule change is a deviation from normal procedure.

109. The conservator, Doris Delaney, was appointed on September 2, 2016. She was appointed as the conservator for Kashmere High School. Doris Delaney was not appointed as a district-level conservator. HISD does not and did not have a district-level conservator for four consecutive years. This rationale for takeover is not grounded in fact or reality.

110. HISD's accreditation status was lowered as a result of an investigation with contested facts and disputed results. There has not been a final determination or adjudication of any of its recommendations. This cannot be a basis for the disfranchisement of thousands of voters.

111. TEA's policy choice to replace the educational leadership of HISD is fueled by a racially discriminatory and impermissible purpose.

## V.  Causes of Action

### Count 1 – Section 2 of the Voting Rights Act

112. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

113. The choice by TEA to remove from leadership the elected Board of Trustees of HISD is an election change that results in a denial or abridgement of the right to vote of individual plaintiffs and organizational plaintiff's members on account of their race, color, or ethnicity, by

having the effect of canceling out or minimizing their individual voting strength as minorities in Texas. This election change does not afford individual plaintiffs and organizational plaintiff's members an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs and organizational plaintiff's members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301 *et seq*.

### Count 2- Equal Protection Clause of the 14th Amendment to the US. Constitution

114. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

115. The choice by TEA to remove from leadership the elected Board of Trustees of HISD is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis race and national origin in violation of 14th Amendment to the U.S. Constitution.

### Count 3 – 15th Amendment

116. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

117. The choice by TEA to remove from leadership the elected Board of Trustees of HISD is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis of race and national origin in violation of 15th Amendment to the U.S. Constitution.

### Count 4 – Violation of the Texas Equal Rights Amendment

118.Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

119.The choice by TEA to remove from leadership the elected Board of Trustees of HISD is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis of race and national origin in violation of the Texas' Equal Rights Amendment, which

states "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." Tex. Const. Art. I § 3a.

**VI. Request for Injunctive Relief**

120. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

121. Plaintiffs will likely succeed on the merits, because the HISD trustee districts are minority-majority single-member districts that are protected from vote dilution by federal and state law. The policy choice of the TEA to nullify the recent and previous trustee elections is an election change that nullifies the electoral voice of the minority voters of HISD, including the plaintiffs.

122. Plaintiffs will suffer immediate and irreparable injury if the TEA is allowed to subvert HISD elections and replace the elected Board of Trustees with an unelected board of managers, which will eliminate the right to vote in trustee elections in the near term and injure federally-protected voting rights. In addition, the unelected board of managers will take adverse action against the teaching professionals of HFT affecting their employment contracts. The individual plaintiffs will be injured by adverse actions of the board of managers on their existing teaching contracts. HFT will also need to expend resources to combat these adverse actions.

123. There is no harm to the State by allowing the plaintiffs the ability to elect trustees to HISD and allow all the plaintiffs the right to vote.

124. The injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based. The right to vote for the educational leadership of an ISD is granted by statute, protected by federal and state law, and

guaranteed by the U.S. and Texas Constitutions. It is the public interest of this State to protect the right of every person to cast a meaningful vote to elect leaders to public office.

125. Plaintiffs have no other adequate, plain, or complete remedy at all other than enjoining the TEA.

126. Plaintiffs request that the Court enter a permanent injunction prohibiting Defendants TEA and the Commissioner from taking any adverse actions against Houston ISD and/or its Board of Trustees based on the Special Accreditation Investigation or, if adverse action has begun, an injunction preventing TEA from installing a board of managers for HISD because of its immediate and irreparable harm to minority voters.

## VII.    CONCLUSION AND REQUESTS FOR RELIEF

127. For the foregoing reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

> A. Appropriate preliminary and permanent injunctive relief to which it shows itself entitled;

> B. Entry of a declaratory judgment as described above;

> C. Attorneys' fees and court costs; and,

> D. Any other or further relief, in law or equity that the Court determines that plaintiffs are entitled to receive.

**DATED**: February 25, 2020                                    Respectfully,

                                                                By: /s/ *Martin Golando*

                                                                GARZA GOLANDO MORAN, PLLC

Texas Bar No. 24059153
Jose Garza
Texas Bar No. 07731950
405 N. St. Mary's, Suite 700
 San Antonio, Texas 78205
Office: (210) 892-8543
Fax: (210) 405-6772
Email: martin.golando@gmail.com
Email: garzpalm@aol.com

 Martha P. Owen
 State Bar No. 15369800
 DEATS, DURST & OWEN, P.L.L.C.
 707 W. 34th Street, Suite 3
 Austin, Texas  78705
 (512) 474-6200 – Telephone
 (512) 474-7896 – Telecopier
 Email:  mowen@ddollaw.com

 Attorneys for Plaintiffs