# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HOUSTON FEDERATION OF TEACHERS, TEXAS AMERICAN FEDERATION OF TEACHERS, JACKIE ANDERSON, MAXIE HOLLINGSWORTH, AND DANIEL SANTOS, | § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CAUSE NO. 5:20-CV-222-XR |
| THE TEXAS EDUCATION AGENCY; MIKE MORATH, COMMISSIONER OF EDUCATION, in his official capacity, | § § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTION TO DISMISS AND MOTION TO TRANSFER VENUE

### I.      Introduction

This is a voting rights case based on the Voting Rights Act, 52 U.S.C. § 10301 *et seq*.,[1] as well as related provisions of the United States Constitution and Texas Constitution. The Plaintiffs are individual teachers and voters and their labor union, the Houston Federation of Teachers and Texas American Federation of Teachers. The claims arise from the actions taken by the Texas Education Agency (TEA) to remove the elected Board of Trustees of Houston Independent School District (HISD) after the school board rejected an attempt to privatize the school district. In-district charter schools are the preferred policy of Anglo voters in HISD and Anglo voters in the State of

---

[1] *Formerly* 42 U.S.C. § 1973

Texas. When the attempt to privatize HISD failed, only then did Commissioner Morath begin his investigation of HISD. In the view of the Defendants, either minority voters or their chosen elected officials bend to the will of Governor Abbott, Commissioner Morath and the TEA or they will be removed, eliminated, and nullified. The State's defense to this plainly impermissible action is that **all** HISD voters will be disfranchised, regardless of race; and thus, the action is not racially discriminating.  However, Anglo voters in HISD don't have to win elections or even vote to achieve their educational policy goals. They must only wait until the TEA installs a board of managers that will ratify their political will without the necessity of casting ballots. Without question, TEA's disfranchisement dilutes minority voting strength and violates the U.S. Constitution and federal law. The Defendant's Motion to Dismiss and Motion to Transfer Venue must be denied.

Plaintiffs will respond to the Defendants' Motion to Transfer in Section II. Then, the Plaintiffs will respond to the Defendants' Motion to Dismiss in Sections III-VI.

## II.    Transfer of Venue

### A.  Legal Standards to Transfer Venue

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." It is within the district court's sound discretion whether to transfer venue under section 1404(a). *Mohamed v. Mazda Corp.*, 90 F.Supp.2d 757, 768 (E.D. Tex. 2000).

"The party seeking transfer of venue must show good cause for the transfer. The moving party must show that transfer is 'clearly more convenient.' Otherwise, a plaintiff's choice of venue must be respected." *Zurich Am. Ins. v. Tejas Concrete & Materials, Inc.*, 984 F. Supp. 2d 714, 720

(W.D. Tex. 2013) (citations omitted). "Defendants seeking a transfer cannot carry their burden by merely making unsupported assertions, but rather they must properly establish relevant venue facts by affidavit, deposition or otherwise." *In re Triton Ltd. Sec. Litig.*, 70 F. Supp. 2d 678, 688 (E.D. Tex. 1999). The moving party bears the burden of showing why the forum should be changed. *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966).

When considering whether to transfer venue, the district court "must exercise its discretion in light of the particular circumstances of the case." *Hanby v. Shell Oil Co.*, 144 F.Supp.2d 673, 676 (E.D. Tex. 2001). "[T]he first determination to be made is whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (citation omitted). Next, "[t]he determination of 'convenience' turns on a number of private and public interest factors, none of which are given dispositive weight." *Id.* (citations omitted).

Among the private concerns, courts consider "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* (citations omitted). The public concerns to be considered include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id.* (citations omitted).

**B. Argument**

"The plaintiff's choice of forum is 'a paramount consideration in any determination of [a] transfer request, and that choice should not be lightly disturbed.'" *In re Triton Ltd. Sec. Litig.*, 70

F. Supp. 2d 678, 688 (E.D. Tex. 1999) (quoting *Young v. Armstrong World Indus.*, 601 F.Supp. 399, 401 (N.D.Tex.1984)). The plaintiff's choice of forum will not be disturbed unless it is clearly outweighed by other factors. *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir.1981).

The Defendants have failed to support their motion with evidence, relying instead on unsupported assertions. It is not sufficient to merely make bald assertions or unqualified assumptions in the attorney's briefs. *In re Triton,* 70 F. Supp. 2d at 688. On this basis alone, the motion should be denied.  However, the private and public concerns raised by the State still do not outweigh the deference afforded Plaintiff's in their choice of venue.

      **i.**     **Private Interests**

                **Ease of Access to Sources of Proof**

The Defendants assert that "sources of proof related to TEA's decision are in the Austin Division." Dkt. #8, p. 6. However, the Defendants fail to describe or detail any of the sources of evidence that is solely present in the Austin Division. "To demonstrate transfer will result in more convenient access to sources of proof, a movant must identify the sources of proof with specificity." *Weaver v. Stroman*, No. A-16-CA-1195-SS, 2016 WL 7410746 at *3 (W.D. Tex. Dec. 20, 2016) (citation omitted). There are also important documents and witnesses associated with this case located in the San Antonio Division. Plaintiffs allege that TEA has sought to replace the elected Boards of Trustees of several school districts in San Antonio. Dkt. #1 at ¶ 94. ("Since 2008, 13 of the 14 school districts targeted by TEA for takeover were minority school districts. These investigations and interventions have been focused largely on urban school districts, especially in San Antonio. Southside ISD and Edgewood ISD have already had their elected leadership replaced by TEA. Harlandale ISD has been investigated and threatened with board removal. And, South San Antonio ISD is currently under TEA investigation.") "Where important documents are located

in both venues, this factor does not weigh in favor of transfer." *Zurich Am. Co.*, 984 F. Supp. 2d at 725.

Although records are likely to be found outside of the San Antonio Division, the Defendants have failed to identify them, their relevance, or where they may be found. Where, as here, the movant fails to explain how transfer to another venue would make document production less burdensome, this factor does not favor transfer. *Healthpoint, Ltd. v. Derma Sciences, Inc.*, 939 F. Supp. 2d 680, 688-89 (W.D. Tex. 2013). Additionally, this factor does not weigh in favor of transfer where documents are likely to be exchanged electronically. *Id.*

For these reasons, this factor *disfavors* transfer or is, at best, neutral.

### The Availability of Compulsory Process

The party seeking to transfer venue must identify unwilling witnesses for whom compulsory process will be needed. *See Zurich Am. Co.*, 982 F. Supp. 2d at 725-26. The movant's failure to argue that compulsory process would be necessary to secure the presence of witnesses at trial renders this factor neutral. *Healthpoint*, 939 F. Supp. 2d at 689. At best, Defendants obliquely argue that their "employees, and their records are in Austin." Dkt. #8, p. 6. Each of these witnesses is within the threshold of compulsory process. The distance to San Antonio from Austin does not exceed the "100-mile threshold" the Fifth Circuit has established for assessing "inconvenience to witnesses." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 317 (5th Cir. 2008); *see also Contreras v. Tri-Nat'l, Inc.*, 2012 WL 12897927, at *4 (S.D. Tex. Jan. 9, 2012).

For these reasons, this factor disfavors transfer or is, at best, neutral.

### No Evidence that a willing witness will have to travel over 100 Miles

"When a movant claims that transfer is warranted for the convenience of witnesses, the movant must specifically identify the key witnesses and outline the substance of their testimony."

*Weaver*, 2016 WL 7410746 at *4 (citation omitted). "[I]t is the convenience of *non-party* witnesses, rather than of party witnesses, that is more important and accorded greater weight in a transfer of venue analysis." *Healthpoint*, 939 F. Supp. 2d at 690 (quoting *Frito-Lay N. Am. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 870-71 (E.D. Tex. 2012)).

Defendants fail to identify *any* non-party witness who may have to be compelled to testify at trial or at a deposition. Plaintiffs concede that it is possible that the testimony of some non-parties may be required. There are some witnesses that live and work in Houston, for example, 5whose testimony may be relevant to certain of the claims of the Plaintiffs. However, for these Houston-based witnesses there is no real difference in the inconvenience created by San Antonio or Austin, as both are roughly equal in terms of distance and availability of transportation. Even if any non-party witness lives or works further than 100 miles from San Antonio (and Defendants identify none), the Defendants provide no evidence or argument that any such witness would incur "substantial expense" if called to testify at trial or in a deposition. *See* Fed. R. Civ. P. 45(c)(1)(B)(ii). The availability and cost of transportation from Houston to Austin compared to Houston to San Antonio favors San Antonio in terms of cost. *See* Exh. 1.

Here, again, the Defendants fail to identify *any* willing witness who would have to travel over 100 miles to the San Antonio Division or the substance of any testimony.  Although the time to designate expert witnesses has not been set at this early point in the litigation, the Plaintiffs expect that they will designate multiple expert witnesses, at least one of which resides in San Antonio. The additional costs of housing the experts in Austin compared to San Antonio will increase the litigation costs for the Plaintiffs. *See* Exh. 1.

For these reasons, this factor is, at best, neutral.

**Trial in San Antonio will be expeditious and inexpensive**

The Defendants cite the following practical considerations concerning litigation in San Antonio. The Defendants assert that "all of Defendants' attorneys and one Plaintiffs' attorneys are in Austin." Dkt. #8, p. 6. The Fifth Circuit has held that "the convenience of counsel," which previously was considered, "is not a factor to be assessed in determining whether to transfer a case under § 1404(a)." *In re Volkswagen AG*, 371 F.3d at 206 (citing *In re Horseshoe Entm't*, 337 F.3d at 429,434 ("[t]he factor of 'location of counsel' is irrelevant and improper for consideration in determining the question of transfer of venue")).  Next, the Defendants misstate that "none of the Plaintiffs are located in the San Antonio Division." This is false. While the Texas American Federation of Teachers has an office in Austin, it has "more than 4,600 [members] in the San Antonio area, including in San Antonio ISD, South San Antonio ISD, North East ISD, Harlandale ISD, and Northside ISD." Dkt. #1 at ¶ 3. Some of these San Antonio members are also witnesses to TEA investigations in their districts and in their schools. These witnesses can and will provide strong insight into the process of investigation and TEA's disparate treatment of minority-majority school districts. Then, the Defendants make another un-evidenced assertion, "[t]he costs of trial will be lower in Austin." Dkt. #8, p. 6. This claim has no evidentiary support and cannot be evaluated by this Court for that reason. However, if this is true, it is only true for the Defendants. Travel to Austin for the Plaintiffs' lay witnesses, expert witnesses, and attorneys would also be expensive. *See Exh. 1.* "In general, a transfer should not be made where the only practical effect is to shift inconvenience from the moving party to the non-moving party." *Zurich American Co.*, 982 F. Supp. 2d at 726 (citation omitted).

For these reasons, this factor disfavors transfer or is, at best, neutral.

ii.     **Public Factors Disfavor Transfer**

**This Court is just as familiar with the VRA as any other court in Texas**

Texas again makes a few unproven assertions concerning the public factors that this court should consider in evaluating its Motion to Transfer. First, Texas states, "[t]he public interest factors also favor transfer to the Western District." Dkt. #8, p. 6. The San Antonio Division is in the Western District of Texas. Then, Texas cites to the federal case filed by HISD against the TEA that relates, generally, to this matter. In the Defendant's words, "Judge Yeakel has already held a preliminary injunction hearing on the same, or at least substantially overlapping, issues, and at that hearing, these same Plaintiffs had an opportunity to present their claims", which "favors transferring this case to the Austin Division and Judge Yeakel, where the courts are already familiar with the intricate issues that gave rise to this suit." *Id*.

These arguments are misleading, at best. First, the Plaintiffs did not file or seek a preliminary injunction in the HISD case. Certain of the Plaintiffs sought intervention into the pending federal matter. This intervention was granted. When the intervention was granted, Texas immediately acted to prevent the intervenors from offering evidence in support of HISD's preliminary injunction. A short telephonic hearing ensued in which the Court decided that Plaintiffs would be allowed to file one affidavit and one plaintiff was allowed to testify live for 15 minutes at HISD's preliminary injunction hearing. There was no adjudication of any cause of action or temporary relief sought by the instant plaintiffs in that court. While HISD did seek certain VRA claims, the Court eventually held that the VRA claims sought by HISD were substantially different than the claims brought by the Plaintiffs in this case. The Court, then, **denied intervention as improvidently granted because of the difference between the claims of the HISD and HFT intervenors**. *See* Dkt. #51, p. 13, *Houston Independent School District v. Texas*

8

*Education Agency*, No, 1:19-cv-684-LY, (W.D. Texas 2019) (memorandum opinion). There was no adjudication or consideration of Plaintiffs' claims. The federal claims in that case are also no longer extant, as the case was remanded back to state court with only its state law claims intact. This case is the only federal or state case brought by voters and voter organizations to challenge the legality of the disfranchisement caused by TEA's aggressive action. Indeed, this Court has a deep familiarity with every "intricate issue" associated with the complexities of voting rights litigation, including an inquiry into the impermissible intent of the Defendants. With due respect to the Austin Division and Judge Yeakel, this Court has unparalleled judicial experience with voting rights litigation. For these reasons, this factor disfavors transfer or is, at best, neutral.

Given all of the above, transfer to the Austin Division is unwarranted.

### III.   Plaintiffs are injured because they will be Disfranchised

### A. The Law of Standing

"For purposes of ruling on a motion to dismiss for want of standing, [. . .] the trial court [. . .] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

Article III of the United States Constitution's case-or-controversy provision requires that a plaintiff plead sufficient facts to establish standing, which is an injury in fact. This injury must be "concrete, particularized, and actual and imminent; fairly traceable to the challenged action, and redressable by a favorable ruling." *Monsanto Co. v. Geerston Seed Farms*, 130 S. Ct. 2743, 2752

(2010). Dismissal is appropriate only if it appears certain that plaintiffs cannot prove any set of facts that would entitle them to relief. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also* Dkt. #385, *Veasey, et al. v. Perry*, *et al.*, 13-CV-00193, Order on Motion Dismiss, p. 6. Therefore, in order to invoke the jurisdiction of this Court, the Plaintiffs need only to plead a set of facts, any set of facts, considered and inferred in their best light that allege: 1) an injury connected to the actions of the defendant, and 2) a remedy which would redress the injury.

The Plaintiffs have met that simple threshold.

**B.  Individual Plaintiffs have Standing**

Jackie Anderson, Maxie Hollingsworth, and Daniel Santos are individual voters directly injured by the actions of the Defendants because they will be disfranchised. To begin with, individual voters have standing to challenge election systems in voting rights cases. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) ("We agree that the standing of voters in a voting rights case cannot be gainsaid.") (internal citations omitted). In fact, individual plaintiffs are "injured in fact" by an arbitrary and illegal election change that violates federal law. This injury is more than metaphysical injury; it is concrete, real, and actual meeting all the requirements for standing. *O'Hair v. White*, 675 F.2d 680, 688 (5th Cir. 1982) ("Certainly the injury to O'Hair's fundamental right to vote is at least as palpable as the injuries to environmental, recreational, or aesthetic values that have in other cases sufficed to provide standing.").

Texas posits that the "right to vote" is not a constitutionally protected right. Dkt. #8, p. 9. However, the right to vote is a foundational individual right that is secured by the Constitution. *See Baker v. Carr*, 369 U.S.186, 208 (1962). While the Constitution and federal law allows states to create a large array of elective or appointive systems, no state can create a system that

discriminates on the basis of race. *Gray v. Sanders*, 372 U.S. 368, 379 (1963); *see also* 52 U.S.C. § 10301 *et seq* ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b)") . The complaint makes clear that each of these voters will be disfranchised. Dkt. #1, ¶¶ 4 – 6. The complaint also alleges that this disfranchisement occurs on account of race or other impermissible motives. Dkt. #1, ¶¶ 82, 83, 89, 94, 95, 113, 115, 117, 119.

Beyond intentional race-based disfranchisement, the election change sought by the Defendants also has the effect of diluting the minority voting strength of HISD voters by elevating the policy views and preferences of Anglo HISD voters at the expense of the elected educational leadership of the district. HISD Board of Trustees consists of nine (9) single-member districts many of which are elected by minority voters. Dkt. #1, ¶ 36. Elections are racially polarized in HISD and the State. *Id.*, ¶¶ 38 – 43. Plaintiffs have pled that Latinos and other minorities in Texas are politically cohesive and that Texas' Anglo citizens vote sufficiently as a bloc to enable them to usually defeat the minority voters' preferred candidates. *Id.* at ¶ 42. The appointment of a board of managers by the Commissioner of Education necessarily eliminates the chosen educational leadership of minority voters of HISD rendering their recent and upcoming elections meaningless. This nullification does not afford individual plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs the right to vote in elections in violation of federal law. *See* 52 U.S.C. § 10301, *et seq*. Finally, the Defendants posit that "neither the federal Constitution nor state law confers a specific right-to-vote for Plaintiff's preferred candidates for the HISD board." Dkt. #8, pp. 9-10; *See Rodriguez v.*

*Popular Democratic Party,* 457 U.S. 1, 9 (1982).  However, *Rodriguez* also makes it clear that "when a state …. has provided that its representatives be elected, 'a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.'" *Rodriguez* 457 U. S. at 10 (citations omitted). Moreover, even the cases that the Defendants cite for support of this contention hold that governments may have leeway in the management of their internal affairs "unless … the government runs afoul of a federally protected right." *See Sailors v. Bd. of Ed. of Kent Cty.*, 387 U.S. 105, 109 (1967). Here, Texas law authorizes the selection of HISD trustees by election to single-member districts. *See* Acts 1975, 64th R.S., p. 2300, ch. 717,§§ 1-3, General and Special Laws of Texas, eff. June 21, 1975; Acts 1981, 67th R.S., p. 930, ch. 345, §§ 1-3, General and Special Laws of Texas, eff. August 31, 1981

The Plaintiffs have alleged that the State has violated the federal constitution and a federal statute by disfranchising the individual voters without a compelling reason and on account of race. Race-based disfranchisement and election changes that have the effect of diluting minority voting strength are injuries to federally protected rights that may be remedied by this Court. Put more simply, the Plaintiffs are individual voters who will be disfranchised because of the State's groundless attempt to replace the elected Board of Trustees of HISD. This is injury in fact that is traceable to the actions or omissions of the Defendants. This injury can be remedied. This is also called standing.

### C.  HFT and Texas AFT have Standing

HFT and Texas AFT ("the Organizational Plaintiffs") present classic examples of both organizational and associational standing. The removal of the elected leadership of HISD will directly harm the Organizational Plaintiffs by frustrating their missions of "educating [their] members on voting and to help its membership select leaders who embrace and uphold the interests

12

of its members and the values of the union." Dkt. #1 at ¶¶ 2, 3. That harm will force these plaintiffs to divert resources away from existing projects and towards efforts to ensure voters are not disenfranchised by the removal of HISD trustees, as well as, communicating with and educating voters about the actions of the TEA to ensure that their members' rights are protected. *See* Exh. 1. "In addition, the union expends resources from appropriate and legal sources associated with increasing voter turnout and fostering democratic values." *Id.* The Organizational Plaintiffs also have standing to sue on behalf of their members, whose rights will be directly violated by the removal of the HISD Board. HFT and Texas AFT have "more than 6,100 members in HISD". *Id.* "Most of the members of HFT are residents, voters, and taxpayers of HISD." *Id.*

### i.    Plaintiffs have Direct Organizational Standing

The Organizational Plaintiffs have sufficiently pled multiple forms of direct organizational injury. First, they have pled (1) a diversion of organizational resources to identify and counteract TEA's unlawful action, (2) frustration of their missions, and (3) that the replacement board of managers threatens professional lives of its members. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). This injury need not be "large" or "substantial," and "it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017), (quoting *Ass'n of Comm. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)). Organizations need only show their interests will be "perceptibly impaired." *Id.* at 612 FN 29. The Organizational Plaintiffs have met this low bar for direct organizational standing.

The Defendants' assert that "increasing voter turnout and fostering democratic values" are not cognizable interests for standing purposes. Dkt. #8, p. 12. At the pleadings stage, Plaintiffs need not provide detailed descriptions of the activities from which its funds will be diverted to combat the effects of the TEA takeover of the HISD board. General statements that discuss an

organization's wasted or diverted resources have been determined as sufficient to meet the low bar for organization standing. *Havens*, 455 U.S. at 379, *see also Democratic Nat'l Comm. v. Bostelmann*, __ F. Supp. 3d __, No. 20-cv-240-WMC, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020) (finding complaint sufficiently pled organizational standing by alleging "the challenged provisions will require [the organizational plaintiff] to expend additional resources to assist their members and constituents to overcome [alleged] burdens to exercise their right to vote").

Plaintiffs' allegations about organizational harm are sufficient. In *OCA*, plaintiff's mission was "to promote civic participation and provide civic education, which it carrie[d] out through a 'Get Out the Vote' initiative." 867 F.3d at 609. Because the challenged law impeded "some" of the plaintiff's members from voting, plaintiff "redirected some of its efforts toward educating its members and other members of the public about" the challenged law. *Id.* at 609-10. The Fifth Circuit held this was clearly sufficient for purposes of organizational standing because these voter education efforts "consumed [plaintiff's] time and resources in a way they would not have been spent." *Id.* at 612. Here, Plaintiffs have alleged the waste of resources that had previously been devoted to educating its members on voting and helping to select leaders who embrace and uphold the interests of their members. Dkt. #1 at ¶¶ 2, 3.

In addition, HFT and AFT have alleged that "every member of HFT is an educator or education support employee whose professional lives are threatened by the policies and choices of the board of managers." In response to this alleged injury, the Defendants argue that Plaintiffs did "not even identify the members of the board of managers, let alone what policies they will adopt." Dkt. # 8, p. 12. The Plaintiffs cannot name the board of managers, as the TEA has been enjoined from installing a board of managers for the foreseeable future. However, the Plaintiffs did highlight the policies and choices made by previous boards of managers appointed by TEA and how those

managers affected students and educators in those school districts. "TEA's interventions have rarely led to academic improvement in the school districts in which Boards of Managers have been appointed. After the takeover… student performance declined precipitously in all areas of academic measurement, including student achievement, student progress, closing performance gaps, and postsecondary readiness." Dkt. #1 at ¶ 90. The Plaintiffs further allege that TEA has previously appointed a convicted felon as a board manager. *Id*. at ¶ 91. That the managers have limited experience in education and that the "vast majority of new applicants for a Houston board of managers also lack educational experience." *Id*. at ¶ 92.  As for the policies that AFT and HFT believe are detrimental to the professional lives of their members, the Plaintiffs allege that "TEA seeks managers who do not question its authority and rubber-stamp its pro-charter school agenda." *Id*. at ¶ 93.

In short, the TEA has harmed the Organizational Plaintiffs by diverting or wasting their resources, harming their missions, and proposing to replace the elected board with a managers that have been previously at times criminal, often without educational backgrounds, and focused on policy objectives that radically harm students and teachers. These are the injuries that the Plaintiffs have alleged. That is what will be proven at trial. This is also called organizational standing.

### ii.    Plaintiffs have Associational Standing

The Organizational Plaintiffs also possess associational standing to challenge the appointment of the board of managers on behalf of their members, who include thousands of HISD voters and the individual plaintiffs. Organizations have Article III standing to seek a remedy to an injury to the organization caused by the defendant's conduct. There is "no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422

U.S. 490, 511 (1975). In addition, an organization may assert standing on behalf of its members if: 1) the members would have standing to sue in their own right, 2) the interests of the organization seeks to protect are germane to the organization's purpose, and 3) neither the claim nor the relief requires the participation of the each individual plaintiff. *Hunt v Washington*, 432 U.S. 333, 343 (1977).

The membership of HFT and Texas AFT have standing to challenge the removal of the HISD board. The members of the Organizational Plaintiffs are "are residents, voters, and taxpayers of HISD" many of whom are African American and Hispanic. Dkt. #1 at ¶ 2. In fact, the individual Plaintiffs are also members of HFT and Texas AFT. Dkt. #1 at ¶ 1.  Individual voters have standing to challenge election systems in voting rights cases. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993). Second, the interests of that the organizations seek to protect are certainly germane to the organization's purpose. "[HFT's] mission is to educate its members on voting and to help its membership select leaders who embrace and uphold the interests of its members and the values of the union." *Id*. That mission is germane to this suit, which will ensure the ability of its members to cast meaningful votes in HISD elections. Lastly, "nothing requires the participation" of individual union members, whose interests "are fully represented" by HFT and Texas AFT. For decades, voting rights and community organizations have prosecuted Section 2 suits and voting based constitutional claims. *See e.g. LULAC v. Perry*, 548 U.S. 399 (2006); *LULAC, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012); *LULAC #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 655 (5th Cir. 1995); *N.A.A.C.P. v. Fordice,* 105 F.3d 655 (5th Cir. 1996); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991); *LULAC, Council No. 4386 v. Midland Ind. Sch. Dist.*, 829 F.2d 546 (5th Cir. 1987). All of these organizations sued under representational or associational standing. The relief

requested, here, is prospective and applicable to all HISD voters, whose rights have been injured by TEA's removal of the board of managers. Therefore, the participation of individual members of HFT or Texas AFT is not necessary to obtain relief. *See Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 862 n. 16 (9th Cir. 2011). Texas AFT and HFT have associational standing.

      **iii.**    **The Defendants' "statutory standing" argument is baseless.**

The Defendants' argument that organizations are barred from suing under Section 1983, Dkt. #8 at p. 10-15, contradicts settled and controlling law. The Fifth Circuit has long held that organizations may assert Section 1983 claims under an associational-standing theory. *Ass'n of Am. Physicians & Surgeons v. Texas Medical*, 627 F.3d 547, 551 (5th Cir. 2010) (group had standing to assert § 1983 claims on behalf of members); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981); *see also Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974); *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 800 (S.D. Tex. 2013).

## IV.    No Need to Abstain

Defendants request *Buford* abstention because "[t]his lawsuit interferes with the proceedings of TEA, a state agency." Contrary to Defendants' stance, "[w]hile *Burford* is concerned with protecting complex state administrative policies from undue federal influence, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (1989) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). While abstention is appropriate on occasion, there exists a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them." *Colorado River*, 424 U.S. at 817.

Neither requirement of *Burford* abstention is satisfied by federal court review of the disfranchisement of HISD voters by the TEA. First, there is no state administrative proceeding in which these Plaintiffs may protect their federally-protected right to vote free from racial discrimination. As a general rule, "*Burford* abstention requires the existence of a state administrative proceeding to which the federal court could defer." *Lipscomb v. Columbus. Municipal Separate School District*, 145 F.3d 238, 242 (5th Cir. 1998). Here, plaintiffs' claims neither implicate the procedures of a state administrative agency nor raise state-law issues of only local concern. On the contrary, Plaintiffs allege that Defendants have deprived them of their constitutional and statutory rights arising under federal law and that those rights "are entitled to be adjudicated in the federal courts." *McNeese v. Bd. of Ed. For Cmty. Unit Sch. Dist. 187, Cahokia, Ill.*, 373 U.S. 668, 674 (1963) (refusing to apply *Burford* abstention). Secondly, the law concerning TEA's ability to remove elected boards of trustees is well-settled as a matter of state law. TEA has sought to take over or investigate, at least, 14 different school districts since 2008. Dkt. #1 at ¶ 94. The state law is stable. The question here is whether or not TEA may disfranchise hundreds of thousands of voters even though the District as a whole performs better academically and financially than most other Texas school districts. It is a unique situation that implicates the Plaintiffs' federally protected constitutional rights.

In *Quackenbush*, the Supreme Court further summarized its *Burford* jurisprudence as a truly limited jurisprudential doctrine:

> [T]he power to dismiss under the *Burford* doctrine . . . derives from the discretion historically enjoyed by courts of equity. . . . [E]xercise of this discretion must reflect "principles of federalism and comity." Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," that the State's interests are paramount and that a dispute would best be adjudicated in a state forum. This equitable decision balances the strong federal

18

interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining "uniformity in the treatment of an 'essentially local problem,'" and retaining local control over "difficult questions of state law bearing on policy problems of substantial public import." This balance only rarely favors abstention, and the power to dismiss recognized in Burford represents an "'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'"

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727-28 (1996) (emphasis added; internal citations omitted). The *Burford* abstention is "the exception, not the rule" and is "disfavored as an abdication of federal jurisdiction." *Aransas Project v. Shaw,* 775 F.3d 641, 649, 653 (5th Cir. 2014) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989)) (finding that the federal interest in interstate birds overcame the state's important water management interest). *Burford* abstention is a very narrow, limited exception, particularly in light of this Court's duty to adjudicate all cases over which it has jurisdiction, including Section 1983 actions, voting rights abuses, and violations of the U.S. Constitution.

Accordingly, abstention is not proper here.

## V.     These Claims are not Barred by Sovereign Immunity

Sovereign immunity poses no bar to a plaintiffs who (1) seek prospective injunctive relief and (2) against a state actor who has "some connection" to the challenged law's implementation. *K.P. v. LeBlanc*, 627 F.3d 115, 124-25 (5th Cir. 2010). *Ex parte Young* permits Plaintiffs' claims against Defendant Morath so long as: (1) the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), and (2) Defendant Morath has "'some connection' to the state law's enforcement." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). There can be no doubt that Plaintiffs' have alleged an ongoing violation of federal law and seeks prospective

injunctive relief. It is also without question that Commissioner Morath has "some connection" with the TEA's attempt to remove the elected board members of HISD.

The Defendants concede that sovereign immunity does not protect the TEA from the VRA claim. Dkt. #8, p. 15. *Ex Parte Young* makes clear that Defendant Morath is not protected from any of the federal claims by sovereign immunity. Dismissal of either Defendant for sovereign immunity is unwarranted.

## VI.    The Plaintiffs have stated a Claim

At this stage of the litigation, the Court must, "accept as true all material allegations of the complaint and . . . constru[ing] the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc.* v. Tex. Med. Bd., 627 F.3d 547, 550 (5th Cir. 2010) (internal quotation marks omitted). Dismissal under Rule 12(b)(6) is unwarranted when a plaintiff pleads sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" where the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Plaintiffs make three separate federal claims in this cause of action: 1) violation of § 2 of the Voting Rights Act, 2) an Equal Protection Claim based on the 14th Amendment, and 3) a violation of the 15th Amendment.

### A.  § 2 of the Voting Rights Act

Voting Rights Act violations are deeply fact-intensive and fact-sensitive. The Supreme Court first construed the amended version of § 2 of the Voting Rights Act, 42 U.S.C. § 1973, in *Thornburg v. Gingles*, 478 U.S. 30, (1986).  In *Gingles*, the plaintiffs were African-American residents of North Carolina who alleged that multimember districts diluted minority voting

strength by submerging black voters into the white majority, denying them an opportunity to elect a candidate of their choice. The Court identified three "necessary preconditions" for a claim that constituted actionable vote dilution under § 2: (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id*. at 50-51. Next, the Plaintiffs seeking § 2 relief must also prove several other factors under the totality of circumstances. In sum, voting rights cases involve deeply complex evidence from a multiplicity of disciplines including mathematics, demography, and legal history. In short, these claims are not easy. Because of the profoundly factual nature of voting rights causes of action, there are many cases in which federal courts have found that section 2 may not apply to certain challenged actions.

Despite this, the Defendants throughout their motion overgeneralize the holdings in the cases cited. For instance, the Defendants cite that the Section 2 does not apply to when the selection scheme is appointive rather than elective. *See Searcy v. Williams*, 656 F.2d 1003, 1010 (5th Cir. 1981). However, the *Searcy* Court made only a summary statement about the VRA claims and actually found that "[b]ecause we have held that the statute involved in this case has been applied in a manner that violates the Fourteenth Amendment it is unnecessary to consider the appellants' arguments based on the Fifteenth Amendment and the Voting Rights Act." *Id.* Next the Defendants cite a Michigan case for the proposition that Section 2 does not apply to allowing emergency managers to take over municipalities or a public school system. However, the *Phillips* Court actually held a more nuanced view that "Michigan made a choice between allocating certain powers to appointed individuals rather than elected ones." *Phillips v. Snyder*, 836 F.3d 707, 720 (6th Cir. 2016). The statute and governmental action at issue in this matter and the one analyzed

by the *Philips* Court are vastly different. Then Defendants cite to *Moore* for the proposition that

Section 2 allows the takeover of a school district. However, the Michigan statute at issue in *Moore*

allowed the elective officials to have an advisory role in the creation of educational policy. *Moore*

*v. Detroit School Reform Bd.*, 293 F.3d 352, 354 (6th Cir. 2002). It also allowed for the removal

of the appointive board by election after a term of years. *Id.* at 354. Most importantly, the

Defendants cite to *Chisom v. Roemer*, for the proposition that a jurisdiction is free to flip between

elective and appointive systems to avoid the implications of the Voting Rights Act. *Chisom v.*

*Roemer*, 501 U.S. 380, 401, (1991).  The office in question in *Chisom* was the election of judicial

officers. *Id.* The Supreme Court was discussing the notion that a state could decide to appoint

rather than elect is judges. It did not however discuss the question in terms of isolating a judge or

judges from a single parish to eliminate the vote and select by appointment. In fact, it ultimately

determined that Section 2 and Section 5 of the Voting Rights Act in fact applied to the selection

of judges in Louisiana because: "The reasons why Louisiana has chosen otherwise are precisely

the reasons why it is appropriate for § 2, as well as § 5, of the Voting Rights Act to continue to

apply to its judicial elections." *Id. Chisom* has little to do with case at hand and is inapposite.

HISD is in a factually unique situation that stands apart from any other removal actions

taken against school districts in Texas or, perhaps, the Nation. Dkt. #1 at ¶ 12.  At this stage, the

Plaintiffs allegations are taken as true, the Court must accept the following: 1) Elections in HISD

are racially-polarized (Dkt. #1 at ¶ 38); 2) African American, Latinos, and Asian Americans are

politically cohesive in HISD elections and vote as a bloc for their preferred candidates (*Id.* at ¶

41); 3) In Texas and HISD as a whole, Anglos vote sufficiently as a bloc to enable them, in the

absence of special circumstances to defeat the minority voter preferred candidates of choice

statewide (*Id.* at ¶¶ 42, 47); 4) the minority voting power in HISD elections is protected by the use

22

of minority-majority single member districts (*Id*. at ¶ 43);  5) that HISD and Texas meet the totality of circumstances test (*Id*. at ¶¶ 44 – 88). These facts confer a federally-protected right to vote in HISD elections to minority voters against vote dilution. The elected leadership of the HISD are the preferred electoral choices of the minority community. (*Id*. at ¶ 36). This leadership rejected a charter school proposal that was strongly supported by Governor. *Id*. at ¶¶ 15, 16, 101-102. The Governor is the preferred candidate of choice of Anglo voters in Texas, including the Anglo voters of HISD. *Id*. at ¶ 42. The Commissioner of TEA is appointed by the Governor and the board of managers will be appointed by the Commissioner, which ensures that the charter proposal rejected by the elected leadership of HISD will be immediately enacted. Similar events have happened in the past. *Id*. at ¶ 93. The elected leaders of HISD and the voting strength of minority voters will be nullified and supplanted by the preferred leadership and policies of Anglo voters in Texas and HISD. As a result minority voting strength within HISD is directly diluted compared to non-minority voters in HISD. If these allegations are proven, the choice to remove the board of HISD violates Section 2 the VRA by minimizing the ability for minority voters to enact the educational policies they prefer and does not afford the Plaintiffs an equal opportunity to participate in the political process to elect representatives of their preference.

Next, the Defendants mischaracterize one of Plaintiffs' allegations in the complaint. In their words. "Plaintiffs cannot possibly establish [VRA claim] when they have also alleged that HISD's voting population is only about 9% white." *See* Dkt. #8, p. 18. However, the allegation describes only the student population and not the voter population. Plaintiffs do not have to prove that Anglos are majority of the population in HISD, indeed they are not. That is why the choice to remove the elected leadership of HISD frustrates Section 2 of the VRA.  The Commissioner has made a policy choice to empower the educational policy preferences of Anglo HISD voters at the

expense of racial minority voters, even though those minority members outnumber Anglo voters in HISD. This undemocratic choice is also textbook dilution of minority voting strength.

Finally, the Defendants make the claim that Plaintiffs have offered no "non-conclusory allegations that TEA's decision was "on account of race or color." Dkt. #8, p. 18. On the contrary as discussed above, the Plaintiffs have alleged that the action taken removing the HISD board dilutes minority voting power in a greater amount compared to Anglo voters in HISD and in Texas, at large. This is true in, at least, three ways. First, since minority voters out-number Anglo voters in HISD, in aggregate, the disfranchisement that occurs affects minority in greater magnitude and proportion than Anglo voters. Secondly, the Defendants' choice to replace the HISD Trustees with a board of managers that will rubberstamp Anglo voter's preferred educational policy dilutes minority voting strength by denying them an equal opportunity to participate in the political process and to elect representatives of their choice. Thirdly, minority voters in HISD are a majority in, at least, six of the nine single-member districts. Dkt. #1 at ¶ 36. Anglos form a majority of the citizen voting age population in only two of the single-member districts. *See Id.* at ¶¶ 31, 33. Therefore, mathematically, the disfranchisement affects minority voters more because it eliminates more of their elected leaders.

### B.  The Constitutional Claims

The Plaintiffs make two kinds of equal protection claims. First, that the disfranchisement of HISD voters violates the equal protection clause because similarly situated voters in other school districts are not subject to disfranchisement. This kind of disfranchisement cannot be done without a compelling state interest. The interests outlined in the investigation do not rise to the level of a compelling state interest. Secondly, the Plaintiffs claim that the decision to disfranchise HISD voters was done for an impermissible purpose, specifically on account of race or retaliation.

In addition, the Plaintiffs also make a 15th Amendment claim that the actions taken by the TEA to disfranchise HISD voters is taken on account of race. The Defendants' arguments against these claims overlap, so they are discussed in this response together.

The Defendants counter that the "constitutional claims fail as well" because "[t]he decision to install a board of managers applies to all voters equally, and is thus non-discriminatory." Dkt. #8, p. 18. To begin with, HISD voters are being treated unequally compared to other school district voters. HISD is relatively high-functioning by any measure. "HISD is currently an academically and financially healthy school district that has seen excellent improvement in campus performance and student outcomes. In 2018, 92% of HISD's campuses (252 out of 275) were rated 'Met Standard.'" Dkt. #1 at ¶ 84. In addition, "HISD is financially stable and rates highly in financial integrity unlike previously board of manager school districts. In 2018, the District received a Superior Rating (i.e., an "A") in the Financial Integrity Rating System of Texas. Houston ISD received a rating of 90 out 100." *Id.* at ¶ 85. HISD voters are being disparately treated. "HISD is not unlike many Anglo school districts in achievement and governance." *Id.* at ¶ 86. These similarly school districts are not subject to investigations or disfranchisement. In addition, HISD's minority voters are also being disparately treated compared to HISD's Anglo voters. HISD Anglo voters seek policy preferences and educational leadership that are different that Latinos or African Americans. *Id.* at ¶ 47. The chosen, elected leadership of HISD rejected the policy choices of HISD Anglo voters. *Id.* at ¶ 101. As a response to the defiance of the HISD Board, Commissioner Morath began an investigation against HISD with the sole purpose of removing the HISD board and replacing them with a board of managers that will enact the policies HISD's Anglo voters prefer. The result will be that HISD's Anglo voters get what they prefer without the necessity of winning elections. Ultimately, Anglo viewpoints and Anglo preferred leaders and policy objectives

are amplified and empowered at the expense of the democratically-elected educational agenda of the minority community. Whatever has occurred in HISD, it certainly does not affect all other voters equally in the same manner.

In order to defeat the discriminatory purpose arguments, Defendants make cursory arguments concerning the inadequacy of the pleadings. *See* Dkt. #8, p. 19. In truth, the Plaintiffs have plead sufficient detail to direct the Defendants exactly where and how they believe the invidious discrimination occurred. *See e.g.* ¶¶ 72-111. The Defendants, then proffer supposedly non-discriminatory reasons why the Commissioner acted to disfranchise hundreds of thousands of voters. Dkt. #8, p. 19. The Defendants cite to the low performance of two high schools in the entirety of HISD, which has 280 schools as justification for the removal of the Board of Trustees. However, "HISD as a whole scored a well-above-average 88 academic accountability rating, with just one school out of nearly 300 campuses, Wheatley High School, scoring a 59. But that's not the whole story." Dkt. # 1 at ¶ 74. "Wheatley -- a school comprised of black and Latino students – was able to overcome an accountability system based primarily on standardized tests and pass with a 63. Wheatley would not have been taken over, were it not for a rule that TEA Commissioner Morath enacted in 2018 that allowed TEA to downgrade the rating of a school that did not pass three of four measures, even if the school would have passed otherwise. For Wheatley High School, a passing grade of D was curved down to an F, putting it past the five-year limit set in 2015 and setting up a false choice." *Id.* at ¶ 75. The next justification Defendants posit for the takeover stem from HISD's alleged abuses of the Texas Open Meetings Act (TOMA). Dkt. #8, p. 19. Plaintiffs addressed this issues, as well. "[O]ther ISDs that are elected by Anglo voting majorities have boards that are alleged to have violated …TOMA. For example, Richardson ISD, whose board members are all Anglo, has been credibly accused by a former board member of

engaging in 'walking quorums', which is the same activity alleged by TEA against HISD. The TEA has not initiated an action to take over the board of Richardson ISD, since the allegations of violating the TOMA have been made." Dkt. #1 at ¶ 73. The manner in which TEA has attempted to selectively investigate HISD's supposed violations of TOMA is evidence of intentional discrimination and disparate treatment. Finally, the TEA suggests that the conservator appointment justified the removal of the HISD Trustees. However, this conservator appointment, in this instance, is a part of the proof of invidious motive. "In the course of its actions against HISD, TEA has committed multiple *ultra vires* acts, which were unauthorized by Texas law. These unlawful and unauthorized *ultra vires* acts includ[ing] converting a campus-level conservator into a district-level conservator [and] seeking a district-level conservator for the entirety of HISD. Each of these actions is a deviation from normal procedure." Dkt. #1 ¶ 105. The purpose of this is not to litigate the evidence of discrimination at this time, but to show that Plaintiffs have given the Defendants ample notice of allegations supporting the discriminatory or invidious purpose of the TEA. The allegations in the complaint supporting the constitutional claims go far beyond "conclusory allegations."

Clearly, the Plaintiffs have detailed a sequence of events that justify an inquiry into the racial intent of Commissioner Morath and the TEA. The fact that the Defendants have proffered non-discriminatory motivations for the actions taken by the Defendants reveals two fundamental truths about this case: 1) the Plaintiffs have appropriately given notice to the Defendants of the nature of their claims; and, 2) there is a fact issue concerning these claims that this Court is empowered to adjudicate.

Dismissal at this time would seem unwarranted.

## VII.    Prayer

Plaintiffs pray that Defendants' Motion to Transfer and Motion to Dismiss be denied.

**DATED**: May 11, 2020

Respectfully,

By: /s/ *Martin Golando*

GARZA GOLANDO MORAN, PLLC
Martin Golando
Texas Bar No.  24059153
Jose Garza
Texas Bar No. 07731950
405 N. St. Mary's, Suite 700
San Antonio, Texas 78205
(210) 892-8543
Martin.golando@gmail.com
garzpalm@aol.com
(210) 892-8543
Attorneys for Plaintiffs

Martha P. Owen
State Bar No. 15369800
DEATS, DURST & OWEN, P.L.L.C.
707 W. 34th Street, Suite 3
Austin, Texas  78705
(512) 474-6200 – Telephone
(512) 474-7896 – Telecopier
Email:  mowen@ddollaw.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that, on May 11, 2020, I filed the foregoing Plaintiff Motion for Extension of Time with the Court's ECF/CM system, which will serve a copy on all counsel of record.

/s/ *Martin Golando*

Martin Golando